UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANA L. SUTTICE,

    Plaintiff,

v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.
_____/

No. C 05-02021 WDB

**ORDER**

INTRODUCTION

On December 19, 2005, plaintiff Dana L. Suttice moved for summary judgment, seeking judicial review of a final decision by the Commissioner of Social Security finding that plaintiff was not disabled and denying his Supplemental Security Income ("SSI") benefits. Defendant Jo Anne Barnhart, in her capacity as Commissioner of Social Security, opposed plaintiff's motion and filed a cross-motion for summary judgment on February 17, 2006, asking the Court to affirm the Commissioner's final decision. Plaintiff replied on May 2, 2006. The matter then was deemed submitted for decision by this court without oral argument, pursuant to Civil Local Rule 16-5. After careful review and consideration of the record and the papers submitted, the court hereby DENIES defendant's cross-motion for summary judgment and GRANTS, in part, plaintiff's request for relief by VACATING the

Commissioner's decision and REMANDING the action to the Commissioner for further administrative proceedings consistent with this Order.

## PROCEDURAL BACKGROUND

Plaintiff applied for SSI benefits on January 30, 2003, alleging that he was disabled as of August 1, 2002, due to back pain, difficulty in sleeping, and limited ability to sit and stand for long periods. His request was denied initially and on reconsideration. Plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). In his statement requesting a hearing, Plaintiff indicated that he suffered from depression, as well as back pain. On January 20, 2004, the hearing was held before the Honorable Brenton Rogozen. Mr. Suttice testified at the hearing. He was not accompanied by legal counsel. On February 26, 2004, Judge Rogozen issued a written decision, finding that plaintiff was not and had not been disabled as defined by the Social Security Act and applicable regulations, and denying his request for SSI benefits.

Plaintiff then appealed to the Social Security Administration's Appeals Council, which determined there was no basis for review. On April 6, 2005, Judge Rogozen's decision became the final decision of the Commissioner of Social Security in plaintiff's case. On May 18, 2005, plaintiff filed a complaint in federal court seeking review of the decision. Both parties subsequently consented in writing to proceed before a U.S. Magistrate Judge.

## STANDARD OF REVIEW

The district court may set aside the Commissioner's denial of disability insurance benefits only when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999) (citations omitted). "Substantial evidence" means more than a scintilla but less than a preponderance; it is such evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). "If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098, quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992).

# DISCUSSION

## A. APPLICABLE LAW - STEPS TO DETERMINING DISABILITY

An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A), (B).

The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act.  20 C.F.R. § 404.1520.  The five steps are:

**Step 1.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.  See 20 C.F.R. § 404.1520(b).

**Step 2.** Is the claimant's impairment severe? If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.  See 20 C.F.R. § 404.1520(c).

**Step 3**. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled " and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.  See 20 C.F.R. § 404.1520(d).

**Step 4.** Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.  See 20 C.F.R. § 404.1520(e).

**Step 5.** Is the claimant able to do any other work? If not, then the claimant is "disabled " and therefore entitled to disability insurance benefits.  See 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in

1   "significant numbers" in the national economy that claimant can do: (1) by the
2   testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets
3   this burden, the claimant is "not disabled " and therefore not entitled to disability insurance benefits. See 20 C.F.R. §§ 404.1520(f), 404.1562. If the
4   Commissioner cannot meet this burden, then the claimant is "disabled " and therefore entitled to disability benefits.

5 *Tackett*, 180 F.3d at 1098-99. The burden of proof is on the claimant as to steps one to four.

6 *Id.* at 1098. At step five, the burden shifts to the Commissioner. *Id.*

7 B.   <u>THE ALJ'S DECISION -- APPLICATION OF THE FIVE-STEP PROCESS</u>

8   Applying the five-step evaluative process, the AJL first found that plaintiff had not
9 performed substantial gainful activity since August 1, 2002, the date of the alleged onset of
10 disability.  Next, the Judge found that plaintiff had a "severe" physical impairment of
11 degenerative disc disease, but that plaintiff's mental impairment from depression was "non-
12 severe."  Having found the mental impairment to be non-severe, the ALJ continued to step
13 three only on the issue of degenerative disc disease.  Under step three, the ALJ found that this
14 physical impairment did not meet or equal any of the "listed impairments" described in the
15 regulations.  Given that determination, the ALJ was required to proceed to step four, where
16 he determined plaintiff's "residual functional capacity," or "RFC."

17   The ALJ found that plaintiff's RFC enabled him "to lift and carry twenty-five pounds
18 frequently and fifty pounds occasionally; and he is able to sit, stand, and/or walk for about six
19 hours (each) of an eight hour workday."  The ALJ then concluded that these residual
20 capacities enabled plaintiff to do "medium work," under 20 C.F.R. § 404.1567(c), including
21 work he had done in the past as a "warehouse worker" or "an airline cleaner." Accordingly,
22 he concluded that plaintiff was not disabled within the meaning of the Social Security Act
23 and, thus, that plaintiff should not receive SSI benefits.

24   The evidence on which the ALJ relied in supporting his findings included the
25 following: (1) records from the Gardner Family Health Network for treatment plaintiff
26 received in September 2002 (after the alleged onset of his disability in August 2002) in which
27 plaintiff reported no aches, pains or fatigue; (2) plaintiff's January 2003 medical treatment
28 records for a hernia condition, which also showed that plaintiff reported no pain and that his

4

physical examination was normal; (3) the report of Dr. Anthony Abene, M.D., a consulting physician for the Disability Determination Service (DDS), who examined plaintiff in May 2003 and analyzed an x-ray from October 2002 that plaintiff brought to the examination — Dr. Abene wrote a comprehensive report, which included a diagnosis of degenerative disc disease of the lumbar spine, and opined that plaintiff is able to lift and carry ten pounds frequently and twenty pounds occasionally, and that he is able to sit, stand, and/or walk for six hours of an eight hour workday; (4) the report of Huseini K. Haveliwala, M.D., a reviewing but non-examining consulting physician for the DDS, who opined that plaintiff is able to lift and carry twenty-five pounds frequently and fifty pounds occasionally, and that he is able to sit, stand, and/or walk for about six hours of an eight hour work day; (5) a June 2003 Psychiatric Review Technique Form from DDS reviewing physician Howard Hansell, M.D., who opined that plaintiff had no medically determinable psychiatric impairment;[1] (6) numerous treatment notes spanning from October 2002 to January 2004 from M. MacDonald, M.D., Zheling Chen, FNP, and Josie Gomez, FNP (treating medical professionals at Gardner Family Health Network, Inc.), describing plaintiff's symptoms of back pain and depression, the medical opinions they reached and the treatment they prescribed or provided; and (7) records from Dr. Hoewisch, a chiropractor whom plaintiff saw once on November 13, 2002. In his November 2002 report, Dr. Hoewisch diagnosed plaintiff with "lumbar segmental dysfunction" and "severe lumbar disc degeneration."  Dr. Hoewisch also noted that "Mr. Suttice is undergoing a drug/alcohol rehab. program which has a rule stating that he is not allowed to work until the end of the program, which will be in 7/03. He started the program in Aug. 02."

The ALJ also reviewed but gave little weight to a short (eight line) letter dated January 13, 2004, from Ben S. Wong, M.D., and a questionnaire that was completed on January 14, 2004 by a person seemingly affiliated with Dr. Wong and identified only as Andre K.

---

[1] This opinion was based, in part, on examinations of plaintiff during 2003 by other medical personnel. The records from these examinations indicated that plaintiff had reported that he was not suffering from depression or any other mental impairment, and that he was fully clean and sober after successful treatment of an earlier problem with substance abuse.

Graichen. No medical title for Mr. Graichen was provided; nor were his qualifications described or the bases for his opinions set forth. Dr. Wong reported seeing plaintiff once, on December 30, 2003. He did not describe the extent or character of his examination of plaintiff; nor did he indicate that he had reviewed any of plaintiff's medical records. According to Dr. Wong's letter, plaintiff reported "tenderness along his paraspinal muscles and vertebrae." Dr. Wong also noted that "[o]n xray he [plaintiff] has evidence of some joint space narrowing between vertebrae and some facet joint degenerative changes." Dr. Wong reported "no physical exam findings to suggest siatica" and speculated that the source of the back pain that plaintiff reported might be muscular rather than degenerative disc disease.

On the questionnaire, completed the day before Dr. Wong's letter, and which was made out "To" Dr. Ben Wong, Mr. Graichen opined that plaintiff had back pain, depression, anxiety, and a personality disorder. Mr. Graichen also asserted that plaintiff was able to sit only for about thirty minutes in an eight hour work day, could stand/walk only for about fifteen minutes in an eight hour workday, could lift and carry less than ten pounds only occasionally, had significant problems with reaching and handling, and would be absent from work more than three times a month due to his impairments. Mr. Graichen made these findings after examining plaintiff in December of 2003 and after reviewing an x-ray allegedly taken on January 12, 2004, which Graichen described as showing "L5 presentation consistent with a fracture creating limitations . . ." There is no evidence of this x-ray in the record, however.

Finally, the ALJ considered testimony from plaintiff himself provided during the hearing, including testimony that he stopped working in August 2002 due to back pain, he has had physical therapy and chiropractic treatment since then, he takes muscle relaxers prescribed by Dr. Wong, he has worn back braces for a long time, he cannot play with his grandchildren in the way he would like, he has anxiety attacks and trouble sleeping and eating, he takes various medications for depression, he lives with his sister, and he does not have a driver's license but takes the bus at times. Plaintiff also testified that his twenty-three year

old son was killed[2] and that his mother passed away from brain cancer — both in the last two years.

Applying the criteria set forth in 20 C.F.R. § 416.929 and Social Security Ruling 96-7p, the Judge found that plaintiff's subjective complaints were not fully credible. Specifically, the ALJ noted that there were discrepancies between plaintiff's assertions and the degree of medical treatment sought and obtained (including medications), the diagnostic tests and findings made on examination, and the level of follow-up treatment ordered by the treating physicians. The Judge also found that the medical reports did not corroborate plaintiff's allegations of debilitating pain, noting also that plaintiff refused to have x-rays taken by the DDS consultative examiner, Dr. Abene. In sum, the ALJ concluded that "the allegations by the claimant as to the intensity, persistence, and limiting effects of his symptoms are not well supported by probative evidence and are not wholly credible."

C. REVIEW OF THE ALJ'S DECISION

Plaintiff raises four issues for review: (1) whether substantial evidence supports the ALJ's decision that plaintiff's depression was not severe; (2) whether substantial evidence supports the ALJ's determination that plaintiff's residual function capacity enables him to do "medium work," including that required in his previously held jobs as warehouse worker and airline cleaner; (3) whether the ALJ improperly discredited plaintiff's testimony from the hearing; and (4) whether plaintiff was prejudiced by his lack of representation at the hearing.

1. *Substantial evidence supports the ALJ's decision that Plaintiff's depression was not severe.*

To determine the degree of plaintiff's depression, the AJL rated plaintiff's limitations in the areas of "daily living; social functioning; concentration, persistence or pace; and episodes of decompensation," as required by the technique described in 20 C.F.R. 404 § 1520(a) for assessing the degree of mental impairments. Because he found that plaintiff had minimal, if any, restrictions in these areas, including no episodes of decompensation, the ALJ

---

[2] In his Claimant's Statement, dated September 25, 2003, plaintiff stated that it was his step-son who had been killed. Because a resolution of this issue does not change our result, we will continue to refer to plaintiff's "son" in this Order.

concluded that plaintiff's depression was "non-severe." Having thoroughly reviewed the entire record, we find that there is more than a scintilla of evidence — and such evidence that a reasonable mind might accept as adequate — to support this conclusion.

In reaching this conclusion, the ALJ relied on evidence from Howard Hansell, M.D., who opined that plaintiff had no medically determinable psychiatric impairment. This opinion was based on plaintiff's medical records, including examinations in 2003 during which plaintiff stated he did not feel he suffered from depression or any other mental impairment. Moreover, as of February 3, 2003, in his "Disability Report Adult," Plaintiff listed only his back problems as the reason he stopped working. There is no mention of any mental impairment at all at this time. Similarly, in a report dated March 18, 2003 from Plaintiff's fiancee, there also is no mention of any depression or mental impairment — only back pain. Plaintiff also stated in a July 2003 "Reconsideration Disability Report" that his back pain had increased, but responded "no" when asked whether he had any additional illnesses or injuries.

In September 2003, however, during the period after plaintiff's son had been killed, there *is* evidence of depression. The ALJ relied upon numerous treatment notes from M. MacDonald, M.D., Zheling Chen, FNP, and Josie Gomez, FNP (treating medical professionals at Gardner Family Health Network, Inc.) that were recorded during this period. In some notes, there are observations from the treating doctor that plaintiff was visibly depressed, but in another note the doctor wrote that the depression appeared to be resolving. Likewise, in a treatment note from November 18, 2003, Doctor MacDonald noted that plaintiff had "good eye contact, animated and no sign of distress when relating events of deaths in family." A note from January 13, 2004, on the other hand, stated that plaintiff reports he has mood swings, difficulty falling asleep, difficulty concentrating, and that he has anxiety from prescribed antidepressant medications, Zoloft and Effexor. While inconsistent, these notes suggest that at least on occasion plaintiff suffered from some degree of depression around this time.

The presence of an emotional disorder is not per se disabling, however. That is, plaintiff's "statements [of symptoms] alone are not enough to establish that there is a physical

8

or mental impairment," (*see* 20 C.F.R. § 404.1528), and there still must exist proof of the impairment's "disabling severity." *See e.g., Sample v. Schweiker*, 694 F.2d 639, 642-643 (9th Cir. 1989). To this end, as noted above, the ALJ must assess plaintiff in the areas of "daily living; social functioning; concentration, persistence or pace; and episodes of decompensation." *See* 20 C.F.R. 404 § 1520(a). Thus, even assuming the Gardner treatment notes were sufficient to establish that plaintiff experienced depressive episodes, what the ALJ correctly concluded was missing from the record was evidence that depression significantly limited plaintiff's daily activities.

For example, while a treatment note from January 13, 2004 (the last note before plaintiff's administrative hearing on January 20) stated that "plaintiff actually looks depressed today," and that he lacked "affect" and "animation," there is no mention of any reported or prescribed restrictions on plaintiff's daily life. In fact, to the contrary, in a treatment note from three weeks earlier, on December 23, 2003, Doctor MacDonald noted that plaintiff was "going to class" for bible study and was "exercising regularly." Similarly, Plaintiff himself completed a "Daily Activities Questionnaire" on March 3, 2003, in which he described doing a variety of different activities, including errands, reading, walking, vacuuming, washing dishes, cooking breakfast, watching television, going to church, going out for lunch and dinner with his family, and going to plays and comedy shows. Plaintiff also indicated that he had "no" problems concentrating, "no" trouble finishing chores, "little, if any" trouble following written or verbal instructions, and no problems getting along with people on a daily basis. Plaintiff's fiancee filled out a similar questionnaire on the same day and also reported that plaintiff engaged in a variety of daily activities. Though plaintiff listed these activities in documents completed before September 2003 — the month plaintiff's depression became worse after the death of his son — even *after* that time, when asked in his "Statement When Request for Hearing is Filed" whether his daily activities had changed, plaintiff reported only that "I have been more depressed." Plaintiff did not provide any evidence that his previously described activities had been altered in any way.

Plaintiff also did not report significant limitations on his daily activities during his hearing. While he did testify that he had anxiety attacks, trouble sleeping and eating at times, and that he was "not the same person as he was before," there was no testimony, for example, that his depression confined him to his home, or that he could not get along with family, or that his personal hygiene was suffering, or anything of the sort.

In sum, while plaintiff reported depression — in a treatment note from December 2, 2003, Doctor MacDonald noted that plaintiff states "'I'm real depressed' about every third sentence" — definitive conclusions cannot be drawn from the Gardner Network treatment notes, which are inconsistent as to plaintiff's degree of depression, even in late 2003 — the period when plaintiff reports being the *most* depressed. Most significantly, neither the notes nor any other documents in the record provide substantial evidence that depression had a disabling effect on plaintiff's daily life. Thus, viewed as a whole, the record could quite rationally support a conclusion that plaintiff's mental condition resulted in no more than minimal restrictions on his "daily living; social functioning; concentration, persistence or pace," and that he had no episodes of "decompensation." *See* 20 C.F.R. 404 § 1520(a). Accordingly, though we do not overlook or minimize plaintiff's grief following the deaths of his mother and his son, substantial evidence exists to support the ALJ's conclusion that plaintiff's mental impairment is non-severe.

2. *Substantial evidence does not support the ALJ's determination that Plaintiff's residual function enables him to do "medium work"*

The second issue for which Plaintiff seeks review involves the ALJ's determination of plaintiff's RFC and the conclusion that he is able to perform "medium work" and return to his prior employment. On this issue we find that substantial evidence does not support the ALJ's conclusion. Specifically, the ALJ failed to provide adequate reasons, and we have found none in the record, for rejecting the conclusion of a DDS consulting *examining* physician who turned in a comprehensive report and opined that plaintiff's RFC was below the level for "medium work." Thus, we now credit that opinion as a matter of law, and for the reasons set forth below, remand the matter to the ALJ to re-do step four in the analysis —

10

that is, to re-assess whether plaintiff can perform *any* of the work he has done in the past — given the more limited RFC provided in the examining doctor's report — and, if plaintiff cannot, to proceed to step five in the analysis. *See* 20 C.F.R. § 404.1520(e) and (f).

The Ninth Circuit very recently reaffirmed that, in an SSI case, "[t]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Widmark v. Barnhart*, 454 F.3d 1063, 1066 (9th Cir. 2006) (quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995)). Moreover, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Id*. at n. 2 (quoting *Lester*, 81 F.3d at 831).

The ALJ did not follow this settled law. Instead, in arriving at the conclusion that plaintiff's RFC enabled him to do "medium work," the ALJ rejected outright the report of Dr. Abene, a consulting physician for the DDS who *examined* plaintiff — stating only that Dr. Abene's opinion regarding plaintiff's RFC was "not substantiated by objective evidence in the medical record."[3] After rejecting the examining physician's conclusions without adequate justification, the ALJ elected to rely almost exclusively on the report of Huseini K. Haveliwala, M.D., a reviewing but *non-examining* physician for the DDS. The ALJ adopted wholesale Dr. Haveliwala's findings to ultimately conclude that plaintiff was able to lift and carry twenty-five pounds frequently and fifty pounds occasionally, and that he was able to sit, stand, and/or walk for about six hours (each) of an eight hour work day. This opinion then formed the basis for the ALJ's corollary finding that plaintiff was capable of doing "medium work," which, under the relevant federal regulation, involves lifting "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

---

[3] Near the end of his opinion, the ALJ acknowledges that, "[w]hile normally ample weight is given to the DDS evaluators' opinions, to the extent they disagree with the findings herein, they did not have the benefit of the most recent records in this matter, nor of the testimony at the hearing." The ALJ did not explain what the "most recent records" or testimony revealed, however, and we have found no substantial evidence to support the ALJ's statement.

11

By contrast, Dr. Abene, who actually examined plaintiff on May 25, 2003, and who completed a comprehensive report (as opposed to the report of Dr. Haveliwala, which consisted largely of checked boxes and few written comments), opined that plaintiff was much more limited and was only able to lift and carry ten pounds frequently and twenty pounds occasionally — an opinion that would lead, under the same federal regulation, to the conclusion that plaintiff was capable of undertaking only "light work" — that is, "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." *Id*. at § 404.1567(b).

By rejecting Dr. Abene's opinion *solely* on the ground that it was "not substantiated by objective evidence in the medical record," the ALJ failed to provide "specific and legitimate reasons" for rejecting that opinion, as required by clear Ninth Circuit precedent. *See e.g., Widmark*, 454 F.3d at 1066-67. This constituted legal error. And, indeed, there is no substantial evidence in the record to support such specific and legitimate reasons, should any have been given. Both doctors Haveliwala and Abene relied on the same x-ray of plaintiff and both agreed that plaintiff had some form of degenerative disc disease. There is no other source of evidence in the record to explain the great difference in the doctors' conclusions regarding plaintiff's RFC. In such a case, the law makes clear that the opinion of the examining doctor must prevail because, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Widmark*, 454 F.3d at1066 n.2 (quoting *Lester*, 81 F.3d at 831). Moreover, because the opinions of the two doctors differ significantly on the all-important question of plaintiff's lifting and carrying limitations — the basis for the RFC analysis — the legal error was critical to the ultimate determination of plaintiff's right to receive SSI benefits under step four of the five-step analysis and, thus, cannot be characterized as "harmless." *See e.g., Stout v. Commissioner*, 454 F.3d 1050 (9th Cir. 2006) (prejudicial errors are not harmless).

Additionally, though it does not impact directly on our result, we point out that while Judge Rogozen did *not* provide adequate reasons for rejecting the report and RFC assessment

of Dr. Abene, he *did* provide "specific and legitimate" reasons (*see Widmark*, 454 F.3d at 1067) to give relatively little weight to the short letter from Dr. Wong and the questionnaire from Mr. Graichen. As the ALJ noted, these reports appear "to accept the claimant's subjective complaints, and the above-noted opinions appear reflective of a position of 'advocate' for the patient." That is, Dr. Wong made no effort to characterize the extent, severity, or implications of the physical findings he so sparely reported. Nor did he even intimate that he agreed with plaintiff's assertion that the back pain plaintiff claimed to be suffering was "severe enough to limit him from standing or sitting from prolonged periods, or to lift even moderate loads." Dr. Wong also did not review plaintiff's medical records or any of the earlier acquired physical evidence to determine whether plaintiff's claimed symptoms and impairments could be squared with those sources of information. Moreover (as noted by the ALJ), while Dr. Wong and Mr. Graichen allude to x-rays of plaintiff that allegedly were taken in January 2004, there are no x-rays from this period in the file and no other medical professional has had an opportunity to look at them. The ALJ also pointed out that there is no evidence that Dr. Wong prescribed any pain killers or suggested that Mr. Suttice consider surgical intervention — matters that the ALJ felt a doctor likely would have addressed with patients who reported symptoms and conditions are severe as those described in Dr. Wong's letter and Mr. Graichen's report. It is this type of detailed rationale that is missing from the ALJ's decision to reject outright the opinion of the examining physician, Dr. Abene.

Given the law's preference for the conclusions of the examining physician, and the absence of record evidence to support the ALJ's essentially unexplained rejection of that opinion, we now credit Dr. Abene's opinion as a matter of law and hold that plaintiff's RFC does *not* enable him to perform "medium work," but, instead, would enable him only to do "light work," as that phrase is defined in the pertinent provisions of the Code of Federal Regulations. *See* 20 C.F.R. § 404.1567(a) and (b).

Accordingly, we also must find that substantial evidence does not support the ALJ's conclusion (on the current record) that plaintiff had the capacity to return to his previous

employment as an airline cleaner or warehouse worker. On remand, therefore, the ALJ shall assess, under step four of the analysis, whether plaintiff can work in *any* of his previous jobs, given the more stringent limitations set forth in Dr. Abene's report that limit plaintiff to "light" or "sedentary" work. In doing so, the ALJ should further develop the record about the duties plaintiff performed in his prior jobs of cleaning airplanes and working in warehouses. Should the ALJ conclude that, under the more limited RFC, plaintiff cannot return to any of his previous employment, the ALJ shall proceed to step five in the analysis to assess whether plaintiff can perform any other jobs.

        3.    *The ALJ did not commit legal error in discrediting Plaintiff's hearing testimony*

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Secretary of Health and Human Services*, 726 F.2 1470, 1473 (9th Cir. 1984), citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). When the ALJ finds the subjective complaints of a claimant not credible, he must make specific findings that support the unfavorable conclusion. *Byrnes v. Shalala*, 60 F.3d, 639, 641-42 (9th Cir. 1995).

In this case, plaintiff presented subjective testimony that he had back pain and depression. There was additional objective medical evidence from plaintiff's x-rays that he had some degeneration of the spine, but no objective medical evidence supporting plaintiff's testimony that this degeneration was *completely* debilitating or immobilizing. The ALJ had discretion not to accept fully plaintiff's testimony about his subjective condition. To justify partially discrediting the subjective evidence offered by plaintiff, however, the ALJ was required by the law to articulate reasons or facts that were "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *See Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). Such reasons or facts might include, for example, the nature, location, onset, duration, frequency, radiation and intensity of any pain or other symptoms; treatment undertaken; plaintiff's daily activities; and ordinary techniques

of credibility evaluation. *See Bunnell v. Sullivan*, 947 F.2d 341, 346-47 (9th Cir. 1991) (en banc).

In this case, the ALJ articulated specific bases for partially discrediting plaintiff's hearing testimony, noting that there were discrepancies between plaintiff's assertions and (1) the degree of medical treatment he had sought and obtained (including medications); (2) the diagnostic tests and findings made on examination; and (3) the level of follow-up treatment ordered by the treating physicians. The Judge also pointed out that the medical reports did not corroborate plaintiff's allegations of debilitating pain, and that plaintiff refused to have x-rays taken by the DDS consultative examiner.

After a careful review of the entire administrative record, we conclude that these specific reasons provided by the ALJ are supported by substantial evidence. For example, plaintiff testified at his hearing that he sees a chiropractor for his pain two to three times a week; however, the record reveals evidence of only one visit, on November 13, 2002, to plaintiff's chiropractor, Dr. Hoewisch. The administrative record does not contain any further documentation of further visits to any other chiropractor. In another instance, Plaintiff stated in a July 2003 "Reconsideration Disability Report," that he saw Dr. Hoewisch on July 10, 2003. However, in a handwritten notation on a letter dated August 2003, Dr. Hoewisch stated that he had not seen plaintiff since plaintiff's first visit in November 2002. Plaintiff also stated in that same "Reconsideration Disability Report" that Dr. Hoewisch advised plaintiff not to work because of his chronic back pain. Yet the report in the record from Dr. Hoewisch after plaintiff's single visit mentions nothing at all about work restrictions, and Dr. Hoewisch declined to perform a consultative examination on plaintiff when asked later by the Disability Division of the Department of Social Services.

There are additional inconsistencies in the record that provide further justification for questioning the reliability and accuracy of plaintiff's testimony about the severity of his subjective symptoms. Plaintiff indicated in his "Claim for Disability Insurance Benefits," completed in October 2002, that he stopped working because of "bad back pain." In his

15

"Disability Report Adult," filed with the Social Security Administration on February 2003, plaintiff similarly reported that he stopped working in August 2002 because his back was "giving him problems" and "to continue [his] job performance the pain was too severe." At the hearing before Judge Rogozen plaintiff testified that he stopped working because "my back -- it was really hurting. I was cleaning -- and going up and down the stairs and carrying the vacuum." However, September 2002 treatment records from the Gardner Family Health Network indicate that plaintiff had no "aches & pains" and no "fatigue," as of this date — one month after plaintiff allegedly stopped working because of back pain. In addition, the November 2002 report from Dr. Hoewisch suggests strongly that plaintiff may have stopped working in August 2002 for another reason, wholly unrelated to back pain. This report stated that: "Mr. Suttice is undergoing a drug/alcohol rehab. program which has a rule stating that he is not allowed to work until the end of the program, which will be in 7/03. He started the program in **Aug. 02**." (emphasis added). And there is a letter in the record dated January 29, 2003 from CityTeam Ministries, a residential program for the treatment of addictions, stating that Plaintiff has been a client in the program since September 3, 2002. Yet, plaintiff never mentioned this rehabilitation program as having any impact on his work history. These are not the only instances of inconsistent testimony in the administrative record. We have provided these only as examples to illustrate the type of evidence available to the ALJ in making his credibility determination.

In sum, the ALJ concluded that "the allegations by the claimant as to the intensity, persistence, and limiting effects of his symptoms are not well supported by probative evidence and are not wholly credible." There is ample support in the record for these conclusions.

4. *Plaintiff was <u>not</u> prejudiced by his lack of representation at the hearing*

Finally, plaintiff claims that he did not make a well-informed decision to proceed without a representative at the hearing, and that because he was not represented he suffered unfair prejudice.

16

Prior to the hearing, plaintiff received written notification of the right to have a representative accompany him to his hearing. In addition, at the beginning of the hearing, the ALJ informed plaintiff of his right to have a representative and explained in detail that the hearing could be postponed to another day if plaintiff wanted to wait until his representative was present. In response, plaintiff stated that "I'll go by myself." Plaintiff also indicated that he had an attorney but that the attorney was occupied with another case. The ALJ accepted plaintiff's statement that he wanted to proceed without a representative and, on this record, there is little doubt from the testimony that plaintiff knowingly and voluntarily elected to proceed without a representative.

Even if plaintiff had not legally waived his right to a representative, however, he cannot succeed on this claim because the "[l]ack of counsel does not affect the validity of the hearing unless plaintiff can demonstrate prejudice or unfairness in the administrative proceedings." *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985). Plaintiff claims no specific unfair prejudice, asserting only that ALJ should have done more to probe the relevant facts of his SSI claim. However, the ALJ conducted a hearing, permitted plaintiff to present any additional evidence he had, and questioned plaintiff specifically about his claims of disability, his past work history, and other relevant topics. The ALJ also explicitly asked plaintiff near the end of the hearing whether there was anything else plaintiff wished to tell him. Plaintiff points to no specific areas about which the ALJ failed to inquire and, thus, plaintiff cannot succeed on a claim of prejudice. Accordingly, the Court cannot grant summary judgment on this ground.

///

///

///

## CONCLUSION

The administrative record shows that the ALJ made a legal error in determining plaintiff's RFC. Thus, substantial evidence does not exist in the record to affirm the ALJ's holding that plaintiff is ineligible for SSI benefits. For all of the foregoing reasons, the court DENIES defendant's cross-motion for summary judgment and GRANTS, in part, plaintiff's request for relief by VACATING the Commissioner's decision and REMANDING the action to the Commissioner for further administrative proceedings consistent with this Order.

IT IS SO ORDERED.

Dated: September 15, 2006

/s/ Wayne D. Brazil
_____
WAYNE D. BRAZIL
United States Magistrate Judge